UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCELLUS COOKSEY,<br><br>    Plaintiff,<br><br>  v.<br><br>OFFICER F. FEILDS (Badge # 1300),<br><br>    Defendant.<br>_____/ | No. C 06-383 MHP (pr)<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT** |

**INTRODUCTION**

Marcellus Cooksey, an inmate at the San Francisco County Jail, filed this pro se civil rights action under 42 U.S.C. § 1983, alleging that his constitutional rights were violated by a sheriff's deputy at the county jail. This case is now before the court for consideration of defendant's motion for summary judgment, which Cooksey has opposed. For the reasons discussed below, defendant's motion will be granted and judgment entered in defendant's favor.

**BACKGROUND**

The following facts are undisputed unless otherwise noted:

In December 2005, Cooksey was a pretrial detainee housed at the San Francisco County Jail No. 2. He was housed in a cell that had about 25 people in it. The cell apparently had an area where the inmates slept as well as a "day side" and bathrooms. The jail staff required inmates to wear shirts and not to wear wave caps (also known as "do-rags") on their heads while on the day side.

The jail used housing cards to track significant information about each inmate, such as current charges, disciplinary issues and medical issues for that inmate. Cooksey's housing card indicated that he was awaiting trial on charges of attempted murder, robbery, auto theft, and possession of a firearm by a felon. His housing card also had entries from various members of the correctional staff that reflected a history of misbehavior during his stay in jail. Jail staff had made the following entries on Cooksey's housing card: on May 14, 2005, he had been verbally warned by a deputy about talking with other inmates while he was in administrative segregation; on June 27, 2005, a notice of rule violation was issued for giving his medication to another inmate; on July 3, 2005, a deputy noted that Cooksey claimed a wrist injury and "may be trying to manipulate himself to hospital;" on July 7, 2005, Cooksey threatened another inmate; on July 13, 2005, Cooksey was snorting medication and medical staff said they would discontinue the medication as a result; on July 29, 2005, Cooksey pointed at a deputy and simulated shooting him; on August 7, 2005, a notice of rule violation was issued because he was not wearing a shirt in the common area and was wearing a do-rag after being told not to do so; on September 22, 2005, a deputy documented that Cooksey had been repeatedly warned about wearing a t-shirt and wearing his do-rag; on November 7, 2005, a notice of rule violation was issued for disobeying a deputy's direct order; on November 15, 2005, a notice of rule violation was issued for hiding a sweatshirt in his pants leg; and on November 23, 2005, a notice of rule violation was issued for having extra clothing under his bunk. The housing card did not note any medical issues for Cooksey.

Defendant San Francisco County Sheriff's Deputy Fitzgerald Fields issued a warning to Cooksey on December 22, 2005, notifying him that, under jail rules, he was not permitted to wear a do-rag while on the day side of the cell and was required to wear a shirt while on the day side of the cell.

Deputy Fields documented this warning on Cooksey's housing card and reviewed the rest of Cooksey's housing card. He saw the information described in the preceding paragraph – i.e., the serious charges pending and the extensive history of behavioral problems in jail – on Cooksey's housing card. The information led Fields to believe that Cooksey might be

2

difficult to supervise and manage.  Fields thought inmates facing serious charges were often more difficult to manage because they had less to lose than other inmates.  Fields also thought the repeated behavioral problems suggested that Cooksey might be trying to test his and other deputies' authority.  Deputy Fields also believed, based on his experience, that it was best to deal quickly with inmates who break rules or defy staff because continued defiance can encourage misbehavior by other inmates.

On December 23, 2005, the incident that gives rise to this action occurred.  Deputy Fields saw Cooksey on the day side of his cell shirtless and wearing a do-rag.  Fields told Cooksey he was violating jail rules about proper attire.  Cooksey yelled an obscenity and told Fields to leave him alone, but did not put on a shirt or take off his do-rag.  Fields ordered Cooksey to "cuff up" – jail parlance for an inmate to present his wrists for handcuffing.  Cooksey initially did not cuff up, and instead continued to yell obscenities at Fields or stopped to put his shoes on.  Once other deputies arrived, Cooksey turned and presented his wrists for handcuffing.  Deputy Fields handcuffed Cooksey, using his normal technique.

The parties disagree whether Cooksey told Fields that his wrist was injured when the handcuffs were applied, but Fields knew the housing card contained no instructions for particular handling of Cooksey's wrists.  Fields believed that inmates often told deputies they were injured when they were not in order to receive gentler treatment.  Cooksey stated that the handcuffing involved a painful twisting of his injured wrist and fingers.  He admitted that he did not, however, complain while the handcuffs were put on him or while they remained on him because he did not want to give Deputy Fields the satisfaction of knowing he was hurting Cooksey.

Cooksey was taken to a holding cell by at least two deputies.  The parties disagree as to what happened next.  Deputy Fields states that after he handcuffed Cooksey, he took him down the hall to a holding cell in Post 8 to give him time to cool off and prevent him from inciting other inmates.  According to Cooksey, he was shoved face-down into the holding cell while still handcuffed.  He did not see who shoved him into the holding cell but believes it was Fields because he could hear Fields' voice behind him.  Deputy Fields denies that he

3

shoved Cooksey into the holding cell. Cooksey states that, while on the floor of the holding cell, he felt deputy Fields put a knee on Cooksey's back, cross his legs at the ankles and bend his ankles toward his buttocks, which caused his right knee to pop. Cooksey asked, "why are you torturing me?" but otherwise did not complain of any pain during the entire incident. Deputy Fields denies that he applied a control hold to Cooksey while he was in the holding cell. Deputy Fields states that the description of the event by Cooksey – that, while he was laying on his stomach, someone crossed one of his ankles over the other and bent his ankles toward his buttocks – sounded like a standard control hold used by deputies to prevent inmates from injuring deputies by kicking their legs.

Cooksey was medically evaluated following the incident. The jail medical services records show that Cooksey complained of pain to his left wrist and right knee, but when he was seen immediately after the incident, neither his wrist nor knee had swelling, deformity or discoloration. The records also indicate that jail medical staff concluded that Cooksey was fabricating his symptoms, due largely to his expression of pain when the evaluator moved his hand near to Cooksey's allegedly injured joint but did not actually touch it.

Later that day, deputy Fields issued a notice of rule violation to Cooksey for refusing to remove his do-rag while on the day side of his cell and being disrespectful. The report stated that Cooksey was handcuffed and placed at Post 8 for holding.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in San Francisco County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an

4

element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the action under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

On issues as to which the moving party bears the burden of proof at trial -- such as the qualified immunity defense in this case -- he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537. Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Plaintiff's complaint was verified and therefore is considered as evidence in evaluating the pending motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment. Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) (citing Bell v. Wolfish, 441 U.S. 520, 535-39 (1979)). If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Bell, 441 U.S. at 539. For example, states must be able to take steps to maintain security and order at pretrial facilities, and restraints that are reasonably related to a facility's interest in maintaining jail security are not, without more, unconstitutional punishment. See id. at 540.

For convicted prisoners, to whom the Eighth Amendment applies, the Supreme Court has held that whenever prison officials stand accused of using excessive physical force, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Id. at 7. It is not necessary that a prisoner have suffered significant injury in order to prevail on an Eighth Amendment claim for use of excessive force, but the Eighth Amendment necessarily excludes from constitutional recognition de minimis uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind. Id. 9-

6

10.  Although a prisoner may believe that his rights were violated, "not every push or shove . . . violates [his] constitutional rights." Id. at 9 (citation omitted).

Several circuits have held that the Hudson analysis also applies to excessive force claims brought by pretrial detainees under the Fourteenth Amendment. See United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999); Riley v. Dorton, 115 F.3d 1159, 1167 (4th Cir. 1997). Although the Ninth Circuit has not addressed the issue, it has routinely used the Eighth Amendment as a benchmark for evaluating claims brought by pretrial detainees. See, e.g., Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc) (pretrial detainee alleging due process violation when attacked by other inmates must show deliberate indifference to personal security as would a prisoner bringing such claim under 8th Amendment).

Cooksey's complaint presented only a very cursory description of the incident, and he provided no evidence in his very short opposition to the motion for summary judgment. In fact, most of Cooksey's version of the incident is taken from his deposition transcript, excerpts of which were submitted with defendant's motion for summary judgment. On the evidence, no reasonable jury could conclude that deputy Fields used force that amounted to punishment on Cooksey.

The handcuffing of Cooksey was reasonably related to the legitimate governmental objective of maintaining security and order and did not amount to punishment. Cooksey was handcuffed for the purpose of being removed from the housing area where he was in violation of the rule regarding attire in the day area. Deputy Fields handcuffed Cooksey after he had defied jail rules by being in the day side of the cell without a shirt and with a do-rag – the same misconduct about which he had been repeatedly warned by jail staff including deputy Fields. Deputy Fields wanted to act swiftly to remove Cooksey from the area so that other inmates would not be incited to also disobey the rules. At the time of the incident, deputy Fields was aware that Cooksey had a significant history of misbehavior in the jail and knew that Cooksey had already been warned about his need to comply with jail attire rules. The handcuffing of a disobedient and defiant inmate was reasonably related to the jail's

7

interest in maintaining jail security.

To say that handcuffing was permissible does not end the inquiry because Cooksey also challenges the method of handcuffing, claiming that the handcuffing hurt his wrists. Cooksey has, however, failed to raise a triable issue of fact that the method deputy Fields used to handcuff him amounted to punishment. Deputy Fields presented undisputed evidence that he handcuffed Cooksey using a normal technique for applying handcuffs to an inmate. Cooksey does not dispute that his housing card did not note any need for special handling of his wrist which apparently had been broken earlier. Cooksey admits that he did not express any pain when the handcuffs were applied or remained on him. The medical records indicate that no damage was done by the handcuffing: the nurse who evaluated Cooksey that day noted that there were two linear red marks to the wrists consistent with handcuffs having been on the wrists, but there was otherwise no swelling, deformity or discoloration of Cooksey's wrists or knees. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (allegations of injury without medical records or other evidence of injury insufficient to establish excessive force claim under 4th Amendment). On the evidence in the record, no reasonable jury could conclude that the method used to put handcuffs on Cooksey was malicious and sadistic or amounted to punishment prohibited by the Fourteenth Amendment.

Finally, Cooksey has failed to raise a triable issue of fact that deputy Fields shoved him into the holding cell or inflicted punishment on him once he was in the holding cell. The undisputed evidence shows that Cooksey could not see who was holding him or guiding him into the holding cell – although he could hear deputy Fields behind him, there was more than one deputy behind him. Even assuming that the deputy who shoved Cooksey and applied a knee to his back was deputy Fields, the evidence does not show that the force used rose to the level of a malicious and sadistic use of force or that it was "repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10. Cooksey does not dispute that the ankle-bending hold was a standard control hold applied to prevent inmates from injuring deputies by kicking their legs. Cooksey did not express that he was pained by the move to restrain his legs in the

8

holding cell. Deputy Fields is entitled to judgment as a matter of law on Cooksey's Fourteenth Amendment claim.

Deputy Fields also is entitled to qualified immunity against the claim. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 201 (2001). The first prong is a threshold question; "if no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. Cooksey's claim falters on the first prong because there was not a constitutional violation. Even assuming arguendo that there was a violation of his constitutional rights, Cooksey's claim would fail on the second prong because it would not have been clear to a reasonable officer that applying handcuffs, shoving an inmate into a cell and using an ankle-bending hold to subdue the inmate in compliance with the normal method for doing so was unlawful. The qualified immunity inquiry is deferential to the government official; "[t]he scenario may look different when gauged against the '20/20 vision of hindsight,' but [a court] must look at the situation as a reasonable officer in [the deputy's] position could have perceived it." Marquez v. Gutierrez, 322 F.3d 689, 693 (9th Cir. 2003). The evidence is undisputed that Cooksey had violated jail rules and was taken away from an area where he could incite other inmates to engage in misbehavior. Cooksey also never expressed that he was being hurt when he was hand-cuffed or subjected to the ankle-bending hold. Although Cooksey may have wanted to avoid giving the deputy the satisfaction of knowing he was hurting Cooksey, Cooksey's silence also implicitly conveyed the message that the handcuffing and ankle were not painful. The information available to the deputy on the housing card indicated that the inmate had a history behavioral problems, was in jail on serious charges, and did not have

9

medical problems that required special handling of wrists or legs.  Even if deputy Fields' application of the handcuffs or use of an ankle-bending hold amounted to excessive force that was punishment, it was a reasonable mistake in light of the information available to him. Deputy Fields therefore is entitled to qualified immunity as a matter of law.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED.  (Docket # 14.)  Judgment will be entered in defendant' favor and against plaintiff.  The clerk will close the file.

IT IS SO ORDERED.

Dated: September 20, 2007

_____
Marilyn Hall Patel
United States District Judge